OPINION.
The plaintiff-appellant, Iduna Borger, appeals from the trial court's order granting summary judgment to her mother, defendant-appellee Mary McErlane, and granting McErlane's counterclaim to have Borger declared a "vexatious litigator" pursuant to R.C. 2323.52(A)(3). In her single assignment of error, Borger contends that her act of filing one civil action pro se in the court of common pleas does not make her a "vexatious litigator" — the definition of which requires her to act "habitually, persistently, and without reasonable grounds." We hold, however, that reasonable minds could come to but one conclusion from the documented evidence of repeated episodes of Borger's frivolous pretrial conduct against McErlane: that she acted habitually, persistently, and without reasonable grounds to harass or maliciously injure McErlane.
 NEMESIS 1. Present Action
On September 1, 2000, Borger, an attorney, filed a pro se complaint in the Hamilton County Court of Common Pleas against McErlane and thirteen other defendants. In twenty-two pages of narrative that can best be described as a flight of fancy sounding more like an episode from TheX-Files, Borger alleged that she was the victim of the "Nemesis." Nemesis, according to Borger, was a vast, sinister, protean conspiracy of government officials and other individuals, all of whom had committed their diabolical energies to "arrest, detain, harass, intimidate, embarrass, annoy, abuse, batter, commit feticide, and otherwise interfere with the liberty of and otherwise deny equal protection of the laws to me." Borger even claimed that her "weak-willed" mother, McErlane, was in league with Nemesis, and that "[t]he conspiracy detailed herein had as one of its goals to deprive me of my right to bear children as a way of controlling me specifically in order to silence me, which I was told repeatedly was their main purpose."
Four days later, Borger filed an amended complaint in which she alleged, among other things, that the former Hamilton County Recorder was the leader of the Nemesis conspiracy, and that the conspirators had murdered her child. McErlane filed a timely answer and moved to consolidate the case with Borger's malicious-prosecution case in the court of common pleas, numbered A-0005770, which was filed on September 13, 2000, as the result of Borger's acquittal on criminal charges for trespass and telephone harassment filed by McErlane. The trial court denied McErlane's motion to consolidate. Subsequently, McErlane requested and was granted leave from the trial court to file a counterclaim seeking to have Borger declared a "vexatious litigator" pursuant to R.C. 2323.52.
 2. The Federal Cases
Earlier, Borger, acting pro se, had filed two cases against McErlane in the United States District Court, Southern District of Ohio, claiming violations of her federal civil rights under Section 1983, Title 42, U.S. Code, and setting forth various state-law claims. The cases presaged those in the court of common pleas. On March 10, 1999, the district court dismissed Borger v. McErlane, No. C-1-98-343, in which Borger alleged that McErlane had engaged in a conspiracy with government officials and others to assault, harass, and defame her. In an application for a temporary restraining order filed on February 24, 1999, Borger had claimed, among other allegations, that a conspiracy involving the former Hamilton County Recorder, the FBI, local police, and others had engaged in a plot to delay the order of semen shipments that she needed for artificial insemination.
While the present action in the court of common pleas was pending, Borger filed a second pro se complaint in federal court, captioned Borgerv. McErlane, No. C-1-99-1001. Written in longhand, the complaint included some of the same conspiracy allegations appearing in her first federal complaint. In response to the district court's order of July 14, 2000, to submit evidence in support of her claims, Borger filed an affidavit in which she identified the conspiracy for the first time as the Nemesis, and stated that the police had installed listening devices in her home and had intercepted her telephone calls, that people were repeating things that she had said when alone in her car, and that she had been drugged and secretly video-taped during proceedings in the court of common pleas. On August 25, 2000, the district court dismissed this action as frivolous, observing that Borger's claims fell "squarely in the realm of the fantastic and delusional."
Borger also filed a third pro se conspiracy suit in the United States District Court, Southern District of Ohio, captioned Borger v.Cincinnati, No. C-1-00-0247. Although she did not name McErlane as a defendant, she alleged that she was the victim of a plot by the six defendants, members of Nemesis, who had conspired to interfere with her treatment for infertility and pregnancy. In dismissing this action, the district court characterized Borger's allegations as "delusional, irrational, and wholly incredible."
 3. Pretrial Maneuvers in the Present Action
Borger's strategy in state court mirrored that in her previously filed federal cases. On December 20, 2000, Borger moved for a temporary restraining order, asking the court of common pleas to enjoin McErlane and the defendants from the "conveying of any information or direction concerning Iduna Borger to any other person or entity, and specifically to any medical doctor whom Borger is or will see professionally." She claimed that Nemisis had illegally intercepted her telephone conversations, and that she would suffer immediate and irreparable injury by its "lies" to her physicians. The motion was denied.
After McErlane requested leave from the trial court to amend her answer of October 6, 2000, and to file a counterclaim, Borger subpoenaed McErlane and three physicians to testify on January 8, 2001, at a hearing on the motion to amend. McErlane successfully moved to quash the subpoenas.
As we have noted, the trial court granted McErlane leave to file an amended answer and a counterclaim to declare Borger a "vexatious litigator." The next day Borger requested that the trial court refer the case to arbitration or mediation because the parties were "not far apart as to settlement." McErlane opposed the motion, arguing that settlement was not at all feasible since Borger would not honor a settlement agreement. In her memorandum, McErlane informed the court that the futility of arbitration or mediation was apparent from two earlier unsuccessful mediation attempts with Borger in the Sixth Circuit Court of Appeals, and another unsuccessful attempt through the local Private Complaint Mediation Service after McErlane had filed state criminal charges against Borger for trespass and telephone harassment. Borger, McErlane stated, had refused to cooperate in the latter because of her claim that Nemesis had made video and audio tapes of her at the `bogus mediation.'" The trial court overruled Borger's motion.
Borger then dismissed her claims against all defendants except her mother, McErlane, whom she continued to pursue. She filed motions to enjoin McErlane "and those in concert therewith to cease the criminal acts of interfering with my witnesses, lying to them, and instructing them to lie." She asked the trial court to return her stocks and property concealed from her by McErlane and, ironically, to have McErlane examined for "any psychiatric illness or organic brain disease." When McErlane opposed these motions, Borger withdrew them.
On January 26, 2000, McErlane served written notice on Borger of the date and time for her deposition. Borger moved to quash service of the notice for her deposition by threatening, in a memorandum filed with the trial court, to call McErlane's counsel as a witness and thus necessitate his withdrawal from the case.
 4. Ruling Below
On February 1, 2001, retained counsel formally entered an appearance on behalf of Borger. Subsequently, Borger, presumably upon the advice of counsel, dismissed her complaint against McErlane, and the parties filed cross-motions for summary judgment on McErlane's counterclaim. The trial court granted summary judgment in favor of McErlane, declaring Borger to be a "vexatious litigator," and overruled Borger's motion for summary judgment. The trial court stated in its order that Borger, "while representing herself pro se, engaged in conduct which obviously served merely to harass or maliciously injure Mary McErlane; conduct not warranted under existing law and that cannot be supported by a good faith argument for an extension, modification, or reversal of existing law; and conduct imposed solely for delay." The trial court also found that Borger "habitually, persistently, and without just grounds engaged in Vexatious Conduct in this action."
 VEXATIOUS LTIGATOR
Because summary judgment presents only questions of law, an appellate court independently reviews the entry of summary judgment de novo. SeePolen v. Baker (2001), 92 Ohio St.3d 563, 564-565, 752 N.E.2d 258, 260. To uphold a summary judgment granted under Civ.R. 56(C), a reviewing court must determine that "(1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 245, citing State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn. (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150, 152.
R.C. 2323.52(A)(3) specifically states that an attorney admitted to the practice of law in Ohio who acts pro se in a civil action may be declared, like any other person, to be a "vexatious litigator." Borger contends, however, that she cannot be declared a "vexatious litigator" by simply filing a single pro se complaint in an Ohio court. We disagree. A "vexatious litigator" is defined in R.C. 2323.52 (A)(3) as "any person who has habitually, persistently, and without reasonable grounds engaged in vexatious conduct in a civil action or actions, whether in the court of claims or in a court of common pleas, municipal court, or county court * * * ." (Emphasis added.) The Ohio Supreme Court has observed that the purpose of R.C. 2323.52 is "to prevent abuse of the system by those persons who persistently and habitually file lawsuits without reasonable grounds and/or otherwise engage in frivolous conduct in the trial courtsof this state." (Emphasis added.) Mayer v. Bristow (2000), 91 Ohio St.3d 3,13, 740 N.E.2d 656, 665, quoting Cent. Ohio Transit Auth. v. Timson
(1998), 132 Ohio App.3d 41, 50, 724 N.E.2d 458, 463. As the italicized language makes clear, a person filing a civil lawsuit in an Ohio court may be declared a "vexatious litigator" so long as that person has used the courts of this state to engage in "vexatious conduct" as defined in R.C. 2323.52(A)(2). It is the nature of the conduct, not the number of actions, that determines whether a person is a "vexatious litigator."
Borger further argues that, because federal cases are not mentioned in the statute, they were not admissible to prove that she acted "habitually, persistently and without reasonable grounds." To support her argument, Borger relies on Carr v. Riddle (2000), 136 Ohio App.3d 700,704, 737 N.E.2d 976, 978-979, in which the Eighth Appellate District held that neither federal cases nor conduct occurring in cases before March 18, 1997, the effective date of R.C. 2323.52, can be used as the predicate action(s) for a finding that a person is a "vexatious litigator."
Although we agree with Carr that civil actions filed in a federal court cannot be the predicate actions for declaring a person a "vexatious litigator" under R.C. 2323.52, that is not to say that they do not have any evidentiary relevance for determining "vexatious conduct" as defined in R.C. 2953.52(A)(2)(a), or to identify a "vexatious litigator" as defined in R.C. 2953.52(A)(3). As provided in R.C. 2323.52(C), an action to declare a plaintiff a "vexatious litigator" is to "proceed as any other civil action." Such an action is, therefore, governed by the Ohio Rules of Evidence. This being so, evidence of Borger's federal cases, filed pro se against McErlane and others, were admissible under Evid.R. 406. That rule provides the following:
 Evidence of the habit of a person * * *, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person * * *on a particular occasion was in conformity with the habit * * *.
 Because McErlane had to prove that Borger acted "habitually and persistently," the allegations Borger made in her federal actions, which were almost identical to those in her state action, were relevant to show that Borger was acting in conformity with a habit — a habit of filing groundless lawsuits against McErlane. The rationale for Evid.R. 406 is that habitual conduct "may become semi-automatic," tending to prove that the person acted in the same manner at a given time. Carter v. Simpson (1984), 16 Ohio App.3d 420, 423, 470 N.E.2d 705, 709. Although a few similar incidents are not necessarily proof of a person's regular practice in a given situation, Borger's paranoid, delusional obsession with Nemesis was circumstantial evidence of her relentless and irrational pursuit of McErlane. In effect, her weapon against her mother in this fantasy was to make McErlane the habitual target of pro se
lawsuits. Borger's actions had thus become predictable, and her frivolous federal lawsuits against McErlane were probative evidence of whether she was acting "habitually, persistently, and without reasonable grounds." See Weissenberger's Ohio Evidence (2001), Section 406.3.
Borger's reliance on Carr, therefore, is misplaced, where, as here, the purported vexatious conduct is a continuation, or carryover, in the Ohio court system of other frivolous civil actions from other jurisdictions. In Carr, the plaintiff's federal action was improperly used as the basis to trigger the "vexatious litigator" action in an Ohio court. Here, however, the "vexatious litigator" action was triggered by Borger's continuing her legal battle against her mother and Nemesis by filing a state complaint. Nothing in the language of R.C. 2323.52 indicates that the General Assembly intended to exempt from consideration the fact that a person who has filed a state action in Ohio has also "habitually, persistently, and without reasonable grounds" filed essentially the same frivolous suit in other forums. Such a pattern of conduct in other jurisdictions is extremely relevant to the issue of whether a plaintiff's state action is vexatious in nature.
We note that in Borger's troubled mind her conduct may be entirely justified and a necessary response to the malevolent forces that she believes are allied against her. There is ample evidence that her persecution complex has completely impaired her judgment, and that in its thrall she truly believes herself to be the object of a nefarious conspiracy. In the real world, however, her conduct is injurious. Significantly, "vexatious conduct," as defined in R.C. 2323.52(A)(2)(a), requires proof that Borger's conduct "serves merely to harass or maliciously injure another party to the civil action." (Emphasis supplied.) It is not necessary, therefore, that Borger intends for her conduct to be harassing, or that she not sincerely believe in the justness of her cause. Rather, it is sufficient that her conduct serves the purpose, or has the effect, of harassing McErlane by obligating her to respond to a legal action for which there is no objective, reasonable grounds.
Here, Borger's pretrial conduct, involving her resort to frivolous motions and unwarranted subpoenas, established that she habitually and persistently engaged in vexatious conduct without reasonable grounds. Her complaint alleging persecution by the Nemesis conspirators was palpably groundless. When the groundless complaint is coupled with Borger's less than rational pretrial maneuvers, it is beyond doubt that her conduct served merely to harass McErlane and to delay the proceedings.
Borger also argues that R.C. 2323.52 deprives her of her constitutional right of access to the courts under Section 16, Article I of the Ohio Constitution. She did not, however, challenge the constitutionality of R.C. 2323.52 in her amended complaint in the trial court and did not serve the Attorney General in accordance with Civ.R. 4.1, which was essential to vesting jurisdiction in the trial court on this issue. Ciccov. Stockmaster (2000), 89 Ohio St.3d 95, 728 N.E.2d 1066, syllabus. Borger cannot now, therefore, raise this issue for the first time on appeal.
Borger further contends that R.C. 2323.25 is constitutionally infirm as applied to her because the trial court imposed a "blanket ban" on her right of individual access to state courts in civil matters. But the order in question, requiring Borger to obtain leave of the trial court to institute a legal proceeding, was an appropriate, narrowly tailored means to screen legitimate claims from the abusive, groundless claims that she has pursued in the past. See Mayer v. Bristow (2000), 91 Ohio St.3d 3,740 N.E.2d 656, 658, paragraph one of the syllabus; See State ex rel.Howard v. Lucas Cty. Court of Common Pleas (2001), 142 Ohio App.3d 761,764, 757 N.E.2d 1, 5.
For the forgoing reasons, the assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
PAINTER and SHANNON, JJ., concur.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.